## ELLIOTT for the use of STANARD *against* CALLAN.

If one who is about to receive the assignment of a single bill, calls upon the payor to know whether he will pay the money, and is informed by him that he will; he cannot afterwards set up any defence against the payment of the money to the assignee, which existed previous to such declaration.

Writ of error to the court of common pleas of Indiana county: the plaintiff in error was the plaintiff below. On the 8th July, 1822, the defendant *James Callan*, appeared in person and confessed judgment to the plaintiff *James Elliott*, for the use of *Daniel Stanard*, for the sum of three hundred and thirty-six dollars and thirty-seven cents.—On the 26th September, 1826, the defendant obtained a rule to shew cause why the judgment should not be opened and he let into a defence: which on the 17th March, 1827, was made absolute. Upon the trial of the cause, the plaintiff gave in evidence the single bill upon which the suit was founded, for three hundred dollars, dated 6th March, 1820, payable 1st July, 1822, with interest from the 1st July, 1821, together with the transfer thereof to *Daniel Stanard*. It was admitted, that the consideration of the said single bill was a conveyance of two out lots in the borough of Indiana, Nos. 1 and 2, by *James Elliott* and wife, to *James Callan*.

The defendant then gave in evidence a deed from *James Elliott* and wife to *James Callan*, dated 6th March, 1820, for out lots Nos. 1 and 2: and also the exemplification of a mortgage from *James Elliott* and wife to *Joseph Brounson*, executor of *William Smith*, deceased, dated 22d November, 1819, and recorded the 15th May, 1820, within six months from its date. It also appeared that this mortgage was given to secure the payment of a bond which bore even date therewith, conditioned for the payment of two hundred and forty two dollars and fifty-one cents, to the said *Joseph Brounson*, by the said *James Elliott* and *Joshua Marlin*, who was his security.

On the 19th February, 1822, *James Callan* and wife conveyed the said two lots to *Joshua Marlin;* and *Joshua Marlin* and wife, by deed dated the 29th of January, 1823, conveyed the same to *Thomas Sharp.*

*William Banks*, Esquire, was then called as a witness, and testified that the bond of *James Elliott* and *Joshua Marlin* had been sent to him for collection; that it was the same money for which the mortgage had been given; that *Elliott* was insolvent, and he applied to *Marlin* for payment, who at first refused, because *Brounson* had not entered up the mortgage, as he alleged he should have done; but afterwards he paid the money, and Mr. *Banks*, by virtue of a power of attorney, entered satisfaction on the margin of the record of the mortgage, on the 10th of August, 1827.

(Elliott for the use of Stanard, *v.* Callan.)

The plaintiff then called *James Elliott*, as a witness, who said, "*Daniel Stanard* was an attorney of this court, and had several claims against me for collection, to the amount of three or four hundred dollars. I told him I had a single bill on *James Callan*, I would give him in payment if he would take it: he said he would agree to take it, provided *Callan* was agreed to it. I then went to Mr. *Callan*, and asked him if he had any objections to my transferring his single bill to Mr. *Stanard*, and told him that perhaps Mr. *Stanard* would give him more time than I could, as I was pressed. Mr. *Callan* then came with me to Mr. *Stanard*, and in his presence, he agreed that I should assign the single bill to Mr. *Stanard*, and said he had no objections, and that he would pay it: my impression was that Mr. *Stanard* gave me receipts on the docket. I know he released me from the payments of money—he never called on me since:—One case was *Nourse* of Baltimore, and *M'Kinstry* was another case; I do not think I ever told Mr. *Stanard* of the mortgage—Mr. *Stanard* agreed to take the single bill as a payment of the claims which he had against me, and settled with me for the whole amount thereof. I paid him the balance in money about a year afterwards —Mr. *Marlin* was only my bail in the bond. I do not recollect that I told *Callan* of the mortgage at the time I sold to him. The single bill was assigned in *Callan's* presence to Mr. *Stanard*.

The plaintiff's counsel requested the court to instruct the jury, that if they believe that *James Callan*, at and immediately before the assignment, knew that *Daniel Stanard* was about to purchase and take an assignment of said single bill, and did then and there inform said *Daniel Stanard*, that he was willing he should purchase and take such assignment, and that he would pay the same, or had no objection to make against the payment of the same—and that in consequence of said declaration, said *Daniel Stanard* did then and there purchase and take an assignment of said single bill, *bona fide*, and for a valuable consideration; said *James Callan* cannot in this action set up as a defence, the fact of an existing mortgage, given by said *James Elliott* on the premises, which was the consideration of the said single bill.

2d. If the jury believe that *Joshua Marlin* on the 29th July, 1823, sold the mortgaged premises to *Thomas Sharp*, and afterwards on the 14th June, 1827, paid the amount of the money due thereon to the mortgagee, who by an attorney in fact entered satisfaction upon the margin of the record of the said mortgage, on the 10th August, 1827—the defendant cannot set up said mortgage as a defence in this suit to the payment of his single bill.

Whereupon the court, (YOUNG President,) charged the jury as follows:

The defence to the recovery of the bond in question, is what is usually termed an equitable one, founded on an alleged failure of the consideration to the extent of two hundred and forty-two dol

(Elliott for the use of Stanard, *v.* Callan.)

lars and fifty-one cents, with interest thereon from the 1st of March, 1823. It appears that *James Elliott* executed a bond, with *Joshua Marlin* as his surety, and a mortgage dated 22d November, 1819, to *Joseph Brounson*, on two out lots, for securing the payment of that debt; he afterwards sold and conveyed those out lots to the defendant, with covenant of general warranty by deed dated 6th March, 1820. The mortgage was not then recorded, but was within six months from its date, and became a lien on the property from that date—it was an incumbrance which *Elliott* was bound to remove; and having failed in this, it is admitted by the counsel for the real plaintiff, Mr. *Stanard,* that the defence would have been good as against *Elliott,* but he contends it is not available against his assignee, who it is alleged purchased the bond *bona fide,* for an adequate consideration, and with the knowledge and consent of the defendant himself. So far as it respects the last matter, it depends entirely on the testimony of *Elliott,* whose bias appears pretty strong in favour of the assignee, and whose confidence in him seems also to have been unlimited; he made the assignment in satisfaction, as he stated, of various claims on him, for moneys he had collected as sheriff, for Mr. *Stanard's* clients, without taking a receipt for any one of them: his first impressson was that Mr. *Stanard* entered receipts on the docket; towards the conclusion of his testimony he stated, that Mr. *Stanard* generally receipted on the docket, as he, the witness, understood. There is no evidence of any receipt, and not even of the memorandum which was taken of the claims, at the time of this transaction: taking the whole of it into view, with his concealment of the mortgage, on that occasion, and so far as it appears on every other, the credit of the witness, to say the least of it, is not superior to exceptions. That subject, however, is for your consideration, rather than that of the court. If you are are not satisfied with the relation he has given: if, in fact, you believe no valuable consideration passed from *Stanard* to *Elliott* at the time of the assignment, the weight of the reasoning founded on it falls to the ground. But admitting a valuable consideration did pass, unless you are further satisfied, that when (as it appears from *Elliott's* testimony) the defendant agreed to the assignment, which was executed in his presence; this ought not to be considered as an undertaking to pay the bond at all events, if he was then ignorant of the mortgage. But it is said that *Callan* said he would pay it; *Elliott* being called again stated that *Callan* did so say.—Were you to believe this, you ought to take into consideration the circumstances under which the declaration was made. There is certainly no testimony of his having been then cognizant of the mortgage; nor until some short time before the motion at September term, 1826, for opening the judgment, which the defendant had confessed.

Mr. *Banks* stated it was about a year before he received the money, which was on the 27th June, 1827; that the bond was

(Elliott for the use of Stanard, *v.* Callan.)

transmitted to him from *Brounson* in Baltimore: the existence of the mortgage was then but little known to any one; and the first notice of ' it seems to have been communicated by Mr. *Marlin*, who was alarmed for fear the mortgage had not been put on record; this led Mr. *Banks* to search, and having found it recorded, Mr. *Sharp* who had purchased from *Marlin*, became also uneasy: his willingness to the making of the assignments, (or as it is otherwise called in the paper on which the court is requested to instruct the jury,) his making no objection to the payment of the same, or even saying he would 'pay it, if ignorant of the mortgage, ought not under such circumstances to avoid the defence now set up. As to the remaining point:—I am of opinion, that *Joshua Marlin*, having sold the mortgaged property to *Thomas Sharp* with general warranty, was justified in paying off the incumbrance, to release himself from an action at the suit of *Sharp*. An action on the mortgage (which was in contemplation,) would have been the consequence, unless the money had been paid, as has been testified by Mr. *Banks*. These legal proceedings would have been attended with costs and expenses, which it was the interest of all parties to avoid, and particularly that of Mr. *Marlin*. It seems there is a balance due on the bond in question, after deducting the principal and interest on the mortgage; that balance the plaintiff is entitled to recover. Having given our sentiments upon the evidence, and our opinion on the questions of law proposed, the whole is now left to your consideration.

In this court the following errors were assigned to the charge of the court below, to the jury:

1st. In charging the jury that " admitting a valuable consideration did pass from *Stanard* to *Elliott* for the assignment of the single bill, and the defendant agreed to the assignment, which was executed in his presence; yet this ought not to be considered as an undertaking to pay at all events, if he was then ignorant of the mortgage."

2d. In charging the jury, " that the willingness of the defendant, to the making of the assignment, or his making no objection to the payment of the single bill, if ignorant of the mortgage, ought not, under such circumstances, to avoid the defence then set up."

*Foster* and *Baldwin* for plaintiff in error.—If an obligor assents to the assignment of his bond, without giving notice that he has a defence against it, he is concluded, and must pay it to the assignee, under all circumstances. *Carnes* v. *Field, et als.* 2 *Yeates' Rep.* 541. *Ludwich* v. *Crall,* 2 *Yeates' Rep.* 565. *Davis* v. *Barr,* 9 *Serg. & Rawle,* 137. *Weaver* v. *M'Corkle,* 14 *Serg. & Rawle,* 304. If an assignee be induced to purchase a bond, in consequence of representations made by the obligor that he has no defence, or is willing to pay, the obligor cannot set up against the assignee any equity, of which he might have availed himself against the obligee, even though such communications were not made directly to the assignee, but

(Elliott for the use of Stanard, *v.* Callan.)

merely communicated to another in his hearing. *M'Mullin* for use, v. *Winner*, 16 *Serg. Rawle*, 18. 1 *Wash. Rep.* 299.

The confession of a judgment by *Callan* was a new promise to the assignee.

*White* and *Alexander* for defendant in error.—It is admitted, that between *Callan* and *Elliott* the defence to the payment of the bond would be a valid and substantial one; and this assignment amounts to nothing more than a transfer of the single bill, by *Elliott*, who was a sheriff of the county, to Mr. *Stanard*, an attorney of the same court, for the security of his clients, who were creditors of the sheriff: it is not therefore a case of a *bona fide* purchase with the assent of the obligor; and therefore the authorities cited for the plaintiff in error are not applicable. The whole aspect of this case shows that no valuable consideration passed from *Stanard* to *Elliott*, but that the single bill was transferred as a collateral security.

In the case of *Burke* y. *Allen*, 3 *Yeates' Rep.* 356, it is determined that although a new promise be made to the assignee, yet "*ignorantia juris excusat.*"

The opinion of the court was delivered by

SMITH, J.—In the court below this was an action of debt, on a single bill, given by *James Callan* to *James Elliott*, dated the 6th of March, 1820, payable the 1st of July, 1822, and equitably assigned to *Daniel Stanard*, the 15th of June, 1822. On the 8th July, 1822, the defendant in person confessed a judgment to the plaintiff for three hundred and thirty-six dollars and thirty-seven cents. On the 26th September, 1826, a rule to shew cause, why the judgment should not be opened, was obtained, which on the 17th of March, 1827, was made absolute, the judgment to remain a lien in the mean time. The cause was tried on the 24th of December, 1828, when a verdict and judgment were rendered for the defendant.

On the trial it was admitted that the single bill has been given in part of the consideration of two out lots in the town of Indiana, sold by *Elliott* to *Callan*, and the record of a mortgage, dated the 22d of November, 1819, duly recorded, from *Elliott* to *Joseph Brounson*, executor of *William Smith*, deceased, on the same lots, was given in evidence by the defendant, who contended, that he was not liable to pay the bill, as the consideration of it had failed.

The plaintiff then proved by *James Elliott*, " that he went to *Callan*, and asked him if he had any objection to a transfer of his bill to *Daniel Stanard*: that on this *Callan* went with him to *Stanard*, and in the presence of *Stanard* agreed that he should assign the bill to *Stanard*, and said he had no objections, and would pay it."

Before the cause was submitted to the jury, the plaintiff's counsel presented certain propositions to the court, and requested them

(Elliott for the use of Stanard, *v.* Callan.)

to instruct the jury, " That if they believed, that *James Callan*, at and immediately before the assignment, knew that *Daniel Stanard* was about to purchase and take an assignment of said single bill, and did then and there inform said *Daniel Stanard*, that he was willing he should purchase and take such assignment, and that he would pay the same, or had no objections to make against the payment of the same—and that therefore in consequence of said declaration, said *Daniel Stanard* did then and there purchase and take an assignment of said single bill, *bona fide*, and for a valuable consideration, said *James Callan* cannot in this action set up as a defence the fact of an existing mortgage given by *James Elliott*, on the premises, for part payment of the purchase money of the premises, for which said single bill had been given." The court thereupon instructed the jury, " That admitting a valuable consideration did pass, unless they were further satisfied, that when (as it appears from *Elliott's* testimony,) the defendant agreed to the assignment, which was executed in his presence, this ought not to be considered as an undertaking to pay *the bond* at all events, if he were then ignorant of the mortgage."

And the court further instructed the jury, that " his willingness to the making of the assignment, (or as it is otherwise called in the paper on which the court is requested to instruct the jury,) his making no objections to the payment of the same, or even saying he would pay it, if ignorant of the mortgage, ought not under such circumstances to avoid the defence now set up." To this charge the plaintiff excepted, and has assigned two errors arising on the same.

If any principle of law can be considered as settled, or ever can remain settled, it is this—that the assignee of a bond or single bill, takes it subject to all objections, which the obligor could legally make. He comes in the place of the obligee, and cannot stand in a different or better situation. So early as 1776, in the case of *Whaler* assignee of *Baynton*, v. *Huzes'* executors, we find in our earliest reports, 1 *Dall.* 23, this principle laid down by an able judge and great lawyer. And in our latest books of reports, 14 *Serg. and Rawle*, 306, the same principle is again recognized; and in a still later case, *Rudy* and wife v. *Wenner*, reported in 16 *Serg. & Rawle*, 18, it was declared that the assignee of a bond, whether the assignment be legal or equitable, takes it at his own peril, subject to every defalcation which might have been made against the obligee by the obligor, at the time of the assignment. But there is an exception. If the assignee previous to the assignment, applies to the obligor, informs him he is about to take an assignment of the bond, and inquires of him, if the money the bond calls for was due, and the obligor declares it is, he is estopped from denying it afterwards; for the obligor by such or similar declarations, promotes and encourages the assignment, and thereby precludes himself from

(Elliott for the use Stanard *v.* Callan.)

the benefit of the right he would have had against the bond origi-
nally. His admissions operate virtually as a new contract between
himself and the assignee. This exception is as well established, as
the rule itself, in the cases above referred to, and in many more.
The case cited by the plaintiff's counsel, (Mr. *Baldwin*,) from *Wash.
Rep.* 296, *Buchner* and others v. *Smith* and others, is strong, perhaps
stronger than the one under consideration, and in my opinion is
decisive of it. There a bond had been given for a gambling debt,
I believe for twenty-five thousand pounds of tobacco. This bond
was afterwards assigned, and an action brought upon the bond, and
judgment confessed by the defendant after he came of age. The
assignee proved that he was induced to accept of an assignment of
the bond by the obligor, who assured him that the bond should be
punctually paid. And the court there said, " the principal objection
is, that this is a gaming debt, contracted by an infant, which no
subsequent act of his, nor any transfer, could make valid.

It is in general true, that an assignee of a bond of this sort, can
be in no better situation than the obligee, and the cases cited at the
bar sufficiently establish the point. But the present case is very
different upon principle from those cases, and that difference is pro-
duced by the obligor's conduct, who by his assurances of payment,
induced the asssignee to receive an assignment of it. He not only
concealed from him legal objections to the bond, but afterwards
assumed to pay it, and when sued, voluntarily confessed a judg-
ment." This case was, in a great measure, afterwards recognized
by the court in *Elliott's* executors v. *Smack*, 390 of the same book.

On these principles, we think the court below erred, when they
instructed the jury, that admitting a valuable consideration did pass
from *Stanard* to *Elliott*, for the assignment of the single bill,
unless the jury were also satisfied, that when the defendant agreed
to the assignment, which was executed in his presence, it ought not
to be considered as an undertaking to pay at all events, if he were
then ignorant of the mortgage. And they moreover erred in
informing the jury that the willingness of the defendants, to the
making of the assignment, his making no objections to the payment
of the same, or even saying he would pay it, if ignorant of the mort-
gage, ought not, under such circumstances, to avoid the defence
set up.

*Stanard*, the equitable assignee, on the 15th of June, 1822, before
he took an assignment of the single bill, and before it was due, asked
the obligor if he was satisfied, he should purchase and take an assign-
ment of the same, and whether he had any objection to make
against its payment: he replied, he was satisfied such assignment
should be made, and had no objection to the payment thereof, and
moreover said he was desirous *Stanard* should purchase and take an
assignment. I would ask, what could *Stanard* do more? All prece-
dent measures were pursued before the transfer was accepted by

(Elliott for the use of Stanard, *v.* Callan.)

him; the party who sealed and delivered the instrument was called on, a full and complete opportunity given to object, if he had any objections; but instead of objecting, answers that he is satisfied, and expresses a wish, that *Stanard* should take the assignment. It is therefore evident that the assignee was induced by the obligor to take the single bill, and part with his money for it. When *Stanard* applied to the debtor, he had a right to suppose, that he was cognizant of every thing which had given birth to the obligation, and that if a defence to it existed, he could and would inform him of it; for this purpose he made the application to him; he is not forbidden by the objector to purchase, but on the contrary is encouraged to do so. Under such circumstances, the obligor's conduct, whether it proceeded from ignorance or design, must be considered as an undertaking to pay. If there be a hardship in the matter, (for instance the existence of a previous mortgage unknown to the obligor, as is alleged) the obligor would be bound, for by his solemn assurances of payment, he induced the assignment; by his concealment of all objections to the bill, he, in fact, promised anew to pay it, and when sued, voluntarily confessed a judgment. We therefore think the plaintiff in error has sustained his exceptions, and that the judgment of the court of common pleas should be reversed, and a *venire facias de novo* awarded.

HUSTON, J.—Agreed to the general principle, but thought the facts of this case did not probably come within it. Here it was *Elliott* who went to the defendant to procure him to make the promise to *Stanard.* Here *Elliott* received nothing from *Stanard;* he was indebted to some of *Stanard's* clients, and assigned this bond in full for their use, though it was not stated so to be. If the jury should find the facts to be so, it is still *Elliott's* bond, and the money when collected, goes to his use and to pay his debts; and in that case the principle would apply, and the defence was not a good one.

Judgment reversed, and a *venire facias de novo* awarded.